May it please the court, this is Matthew Rostin for the appellant Dennis Vincenzini. I would like to start off by saying that appellant has hit all of the marks of factors used to demonstrate the minimal whistleblower standard under California Labor Code section 1102.5. And even if some of the factors are removed, which the district court erroneously did, there is still more than enough here for there to be a triable issue of fact whether he meets this case. I want to start off first talking about temporal proximity, and I want to just highlight something that we should have highlighted more in our summary judgment papers as well as the opening brief, but we did highlight in the reply brief, which is if you see the letter from the FRA dated August 5, 2020, informing Mr. Snow and Mr. Vincenzini that there was not going to be any sort of enforcement action for the COVID-related cases. It says in that letter, and that is on volume 280 in the record, that they did not even investigate this claim until July 28, 2020, meaning that TASI would not have been aware of this complaint until less than a week before they pulled Mr. Vincenzini out of service. So what we're talking about here is square temporal proximity, less than a week, instantaneous at the time that they give a formal letter saying that they are, you know, not going to investigate this further, and when Mr. Vincenzini was taken out of service. This is something that the court certainly didn't entertain. This is something that respondent is certainly dodging in their brief and saying that it has to be March when he made the complaint, which doesn't make any sense whatsoever, since TASI wasn't even aware of it until months later. So, sorry, I have questions about step two of the analysis. We don't confer in advance, so I don't know if my colleagues might have questions about step one also, but I'd just like to assume for a moment that you do win on the argument you're trying to make about step one, and then let's talk about step two. It seems like part of your argument at step two is that the defendant should have had some reason to not believe the data. So the data that show these shutoffs, you're arguing that even though it looked like there were shutoffs, like your client hadn't really caused these shutoffs and the data were just wrong. What is your best evidence of that? Well, I think the best evidence of that is their own admission, and Mr. Freeman stated in his deposition that they didn't even understand why anybody would do an ABV cutoff, and why anybody would do that into a station. They agree that it makes no sense. Well, saying it makes no sense could just be your client did something that was very, very egregious and didn't make sense though, so I'm not sure how that helps you. Is there anything else that you have that shows that they shouldn't have believed the data that looked like there were cutoffs? Yes, I would also then go to the fact that based on Mr. Beauchamp's declaration, and this is something that I don't even think is contested as to whether or not it's expert opinion or not, stated that they were well aware that these PTC records are not reliable, that they can have false positives, and can have wireless issues, and this was known. So I think that is compelling evidence that they had reason to believe that this was not accurate, and the only thing that they relied upon, and this is undisputed in reaching the decision that he actually did this willfully, was the PTC records and the PTC records only, which even if you were to accept that they're valid, still doesn't even get you to the conclusion that he did this willfully as opposed to inadvertently, and the fact that they never even asked Mr. Vincenzini about whether he did it, shows that they just jumped to this conclusion based on these, you know, weak amount of evidence that they know was not reliable, and they just went, you know, straight to the throat to take him out of the company, which was, again, inconsistent with what they did with his railroad license, where they did not even suspend him a single day. So it's very hard to, I guess, put this all together as to why this is a justified, sound decision, and again, this is something that the respondent has to prove by clear and convincing evidence, which is an extremely high standard, and I think given all of this, there's certainly a triable issue of fact for a jury to see, you know, whether or not this, what we're saying is a very loose conclusion based on loose evidence, and Can I ask you about another piece of evidence specifically? So in your client's declaration, paragraph 23, he says, Mr. Stogno informed me that he took part in a conference call with Mr. Griff and Mr. Cold, and was told by Mr. Cold in the conference call that the ABV sometimes cuts out on its own. Do you know when that happened? Like, is that evidence that the company would have known that sometimes the data were not really indicating intentional cutoffs at the time in question? That too, yes. That's just another layer of our argument as to why a jury should be considering this evidence. But do we know, my question is, do we know when this, I mean, because if they had data problems a year earlier, maybe they would have fixed them by now. What do we know about this conversation? Well, we do not have an exact date as to when it occurred. I'll acknowledge that, but what we do have is, we do have a good idea as to when that would have been, because they did not start the program until, I believe it was October 2019. Sorry, is ABV part of the PTC, or those two, I thought there were different kinds of violations. Those are two different things, and that's another reason why we're saying that this is not reliable, because these are PTC records which are meant to show whether the PTC is working. But with these PTC records, it also can show whether or not the other things are working as well, which is the ABV. But that PTC is just, these records are just meant to be used for the PTC. So what they did is, they used these records that are specifically for the PTC, saw something that came on with an ABV, and said, oh, aha, this is a cutout too. We're going to, you know, discipline him for this, and have an investigation where he can't have any and that's how the ABV cutout. But there's other ways to see whether there's an ABV. One is whether you can have a camera and see them cutting it out. Two, whether there are black box records, whether it's cut out. And I apologize, I don't have the site, but there was an email in the record where Mr. Cold acknowledges that the black box did not show an ABV cutout, and that there was no footage of Mr. Vincenzini available to do that. Again, highlighting that the only basis for this conclusion, that not only that he cut out the ABV, but that he did it willfully, is these PTC records, which are just meant to be used for PTC and are a new type of, I guess, electronic record for a system that is new and hadn't even been certified at the of this alleged violations. Does your argument depend on, you know, the possibility that this was a glitch in the system or that he didn't do it intentionally? I mean, in other words, suppose that it were established that he had intentionally disabled the PTC on the five times and the ABV on the one time, what would we do then? Well, I think that it would still be an attributable issue of fact for the jury in that situation to assess all of the factors. But yeah, I will concede that if there was sound evidence that he cut it out and he did it intentionally, which there is no sound evidence, then yes, it would be a much more difficult case for Mr. Vincenzini in this case. But I would still say that given all the factors of this case, the dead-on temporal proximity, the fact that nobody else had been terminated or disciplined for any of these types of violations, the fact that there was already an established acknowledgement that nobody would be disciplined for PTC violations, the fact that there was animosity demonstrated through the general manager, the fact that... Can I ask you about the lack of discipline of anyone else? So this case is sort of odd because I think both sides are saying we don't really have a comparator and it's the other side's problem that we don't. So how do you... If we don't know that anyone around this time period did the same... Was found to have done the same thing that your client is accused of, then how is it meaningful that no one else was disciplined for it around that same time? It's kind of just a nothing, isn't it? Well, I would say two things to that. I would say, one, there is evidence that other people did these similar violations because Mr. Beauchamp said in his declaration that he did find other engineers that had cut out the PTC and they were coached in councils. But let's just go with that hypothetical. Can you point to anything though where it's both intentional and not approved in advance? I'm not sure he really does point to anyone who was found to have intentionally, without permission, done what allegedly your client did. I know you think your client didn't do it either, but is there anyone who was found to have done those things, all of them together? I'll go back and I'll check and I would like to reserve some time for rebuttal and I'll point to the declaration. I thought Mr. Beauchamp did say that there were... I'm looking at ER 84. I routinely caught locomotive engineers not complying with PTC rules, including intentionally cutting out the PTC system without authorization. You found it for me then, Your Honor. Thank you. I guess, when though? Well, that goes to the same point that I'm saying is this is still a limited time period that we're talking about because this was a new system that wasn't even starting to be used until late 2019 and his violations occurred, I think it was during the summer of... Summer of 2020. So the question is, let's just say at the absolute most were seven or eight months removed. At the most. And I don't see why that cannot be considered. Respondent hasn't given any authority as to why that sort of delay cannot be considered. So... I mean, what I understood the district court's sort of... I think it's a little unclear what the district court's evidentiary basis was because it's sort of a long list of things and unclear which one was being used. But I understood the district court to have a concern that Beauchamp, because he only had the job until December of 2019, maybe didn't really know everything by the summer of 2020. He had a different job, but not the same job of supervisor. And then also, as you get closer to when the PTC deadline is, maybe they start being stricter or something. I mean, there are these sort of things that could have changed over time. But what is your answer to that? Why should Beauchamp still be taken into account? Because as indicated in the briefings, he declared in his declaration that he was still consulting with management about these issues, even though he was in engineering capacity. He was still aware of the issues with PTC. So he was still involved. The only difference was he didn't have an exact manager title. So he did lay a foundation for that. And I think that's something that a jury needs to assess and that we can't just discount. So when he says, I was, I think he says something like, I was involved in PTC issues or something sort of vague like that. Do we know that that means, I mean, do we need to infer that that means that those issues were sort of the kinds of violations we're talking about here, as opposed to programming the computer or doing some other thing about, I mean, it's pretty vague what his role was once he wasn't a supervisor anymore after December 2019. At this stage, at summary judgment, is that your problem for not having put in more detail, or is it their problem because we take the inference in your favor? Well, I think the inferences need to be drawn in Appellant's favor. And that is certainly one that that should be. And he did say that he was aware of the issues that were going on with PTC and was still advising them. So I don't see why that is not enough to create at least a foundation for a summary judgment level. I mean, I don't want to cut into your. I can give extra time as needed. Okay. So in your complaint in state court, you allege that Transit America Services is a Missouri corporation with its principal place of business in California. And the notice of removal says it's a Missouri corporation, its principal place of business is Missouri. I didn't see that you had challenged the removal. So do you agree that the principal place of business is Missouri? I don't agree with that. I'm not really prepared to answer that right now. But my understanding is that their principal place of business at the time was in California, but this was brought in California. But why would there be diversity jurisdiction then? Why would we be in federal court? That's a good question. I wasn't expecting that one, but that is something I did not consider. And I guess when they gave that statement in their declaration, I accepted it and decided not to challenge it. Okay. So we have their declaration in the notice of removal and you have not put in anything to challenge that. I have not challenged that. So that's the answer to that. We'll still give you three minutes for rebuttal, so let's hear from the other side and then we'll talk to you again. Good morning, Your Honors. May it please the Court, Vince Castillo here for the Appellee Transit America Services. The district court correctly granted Tassie's motion for summary judgment because even assuming that Mr. Vincenzini engaged in protected activity, no reasonable jury could find that any protected activity contributed to his termination. And the record independently establishes by clear and convincing evidence that Tassie would have terminated Mr. Vincenzini regardless of any protected activity due to the intervening six events, five events that disabled the PTC and the one event that disabled the ABV. One of the things that I heard from the appellant is that there's no evidence that the PTC was cut out. And I hope I'm not misquoting him. I think that's what he said in his presentation. There is. There's an admission by Mr. Vincenzini that he cut out the PTC. One time. One time. Then if you accept that Mr. Beauchamp's declaration is admissible, he says that there's evidence that the four other cutouts were not software glitches. So he acknowledges that those four cutouts were disabled at the time. At deposition, when I asked Mr. Vincenzini to talk about the four other cutouts along with the ABV, his response was, I don't recall. I then followed up and I asked him, is it that you don't recall or are you denying that you did this? The response was always, I don't recall. And stating that you don't recall is not sufficient to create a triable issue. It's ostensibly that that point is established. So I think part of what you're trying to say is we had reason to think that he cut off the PTC five times. And I think you want there to be an inference that even though you can't point to anyone else you fired for doing that, that this is obviously so terrible that it justifies firing no matter what. And so I guess what I'm wondering about is how you deal with the other pieces of evidence in the record that maybe this wasn't such a big deal. So I'm looking at Beauchamp Declaration Paragraph 9 and Beauchamp Declaration Paragraph 14. 9 talks about how engineers were allowed to contact dispatch to obtain authority to cut out the PTC system so that the train could be operated without the PTC. This happened frequently. If that's true, I understand that you're saying he didn't have authorization, but it does undermine the idea that operating without the PTC on wasn't such a bad thing. And if that's true, then why is it so bad that he cut it off? Well, again, I don't know what the circumstances were that Mr. Beauchamp is referring to because he doesn't explain what the circumstances were when he says that the other engineers who sought authorization to cut out the PTC, for instance, I don't know if it happened in a yard. I don't know. I don't have any details. Take the inferences in plaintiff's favor at this point. I mean, you could have deposed Mr. Beauchamp and asked him all those things and boxed him into some other kind of circumstance. But if you didn't, then don't we take that as probably the train was running. So on the issue of deposing him, I he was disclosed for the first time, his opinions were disclosed for the first time on the same day of the deadline to to have rebuttal expert disclosures. So from that standpoint, we were we were effectively precluded from consulting with an expert to go and have an expert. And I don't think this is a paragraph that's expert testimony. I don't even think you say it is paragraph nine. This is just him talking about what he did at the company. Sure. But in what he did at the company, this this is predating the the the incidents by seven, eight months, because he was last involved as a PTC foreman in December of 2009, 2019. As the court observed earlier, he when when he went back to being an engineer, that's all he was doing was being an engineer. He's never once attested to the fact that he was responsible for managing anyone consulting with the other. I find it very puzzling what we do about this in this case, because there are vague. We have uncertainty as to time uncertainty as to what Mr. Beauchamp would have known between December and August. But maybe that's your problem for not having put in more information about those things, because we generally take the inferences in favor of the non moving party. And the inferences would seem to be he's he says he was still involved in the PTC. Maybe we infer that he still would have known these things. Perhaps you could have shown that he wouldn't. But maybe you didn't hear. I we have no information about whether he would have known or not. Your Honor, in responding to your questions, I'm certainly not conceding that Mr. Beauchamp's declaration is admissible. I mean, our objections remain that none of this. I don't think you had an objection to paragraph nine. Can you point to anywhere where you objected to paragraph nine of Beauchamp? Well, what we did was we objected to the entirety of the declaration. I thought just the paragraphs that you said were expert testimony. No, maybe correct me if I'm wrong. We objected to the entirety of the declaration because it doesn't this was an he was disclosed as an expert and he didn't produce a report. And I believe it's rule 37 that if he doesn't produce a report. Right. But you said certain paragraphs. I thought it was like 15 to 17 where what you said were expert testimony. And that's what this whole dispute was about. He should have had a report. I didn't think you objected to paragraph nine on that basis. Point me to where if you did. I believe you're correct that I didn't specifically single out paragraph nine. I think it's just 15 to 17. 15 to 17. I'll take your word for it. But we did have the objection to the overall declaration based on the fact that. Where? Sure. Let me find the reference in the in the order. I mean, I'm looking at page ER 37 to ER 38, which are your objections. And it's 15 to 17 of Beauchamp. Maybe there's somewhere else, but. So what I'm and I apologize. I'm looking at the courts, the district court's order where the court acknowledges that we objected to the entirety of the of the declaration. I think that might be a mistake, though. And we're here to figure out whether the district court made a mistake. Right. I'm confident and I'll ask my colleague if he or if he finds a citation to where we objected to the entirety of of the declaration. But that's my recollection. But I certainly don't want to lead you astray. What would be the objection to paragraph nine? Sure. Because paragraph nine is saying prior to and during August 2020, engineers were allowed to contact dispatch to obtain authority to cut out the PTC system so that the train could be operated without PTC. This happened frequently. He was working there. He was an engineer. He this seems to be personal knowledge. What would be the objection? Let me respond this way that he's the that's about a PT. He's talking about a PTC cut out. He doesn't mention anything about a PTC cut out and an ABV cut out. So there's no comparator there. Right. Because the cutting out the braking system, there's no mention of any other comparator evidence about a cut out of the PTC and the ABV. There's no mention about the regularity of it. We have five instances. So on the ABV, we have Mr. Vincenzini's declaration that started the plaintiff. However, you say his name exactly. And that is paragraph 23 at ER 94. Mr. Stagno informed me that he took part in a conference call with Mr. Griff and Mr. Cold and was told by Mr. Cold in the conference call that the ABV sometimes cuts out on its own. And then there was an allegation that Mr. Stagno had cut out the ABV and he was not charged with any discipline. Putting aside whether Stagno is exactly the same, if the ABV sometimes cuts out on its own, and I don't think there was an objection to that paragraph either, why between those two things do we not have a fact dispute about how much it mattered that the ABV and the PTC were cut out? Part of the reason is, as the court pointed out, there's no evidence of when this occurred. Right. But why isn't that your problem if we're taking inferences in the plaintiff's favor? I mean, I do think we're puzzled by who is right here, because if this was talking about something a long time ago, I think you have a good argument that it shouldn't matter. But you didn't put in any evidence that this conversation happened a long time ago. And some of the people in this conversation were your people. But it's not Tassie's burden to present evidence on that topic. Well, it is on step two. It's your affirmative defense. It is your burden. But by clear and convincing evidence, right? Well, there's clear and it's our position that there's clear and convincing evidence that he was terminated because this was unprecedented, right? There's no comparator who intentionally disabled without authorization the PTC on five occasions and also did the same to the ABV. There's simply no comparator. Sure. But I mean, I guess this is sort of a more fundamental question, I guess. Under Lawson, even if we disregard the Beauchamp evidence and the Mr. Stagno, you have the burden of proving by clear and convincing evidence that the action would have occurred without the protected activity. And at summary judgment, you have to show that there's no genuine dispute of fact that you could establish by clear and convincing evidence. Those two standards piled on top of each other. And if it's never happened before, and in the absence of some you haven't pointed to some written policy that says anyone who does this will be fired. So how it seems like it's a hard burden to meet. And the California Supreme Court said that in Lawson, right? And in Lawson, the objection was made. Nobody's ever going to get summary judgment on this standard. And they said, well, maybe. But how are you able to overcome that standard here? There's a lot in that question, but I apologize. I want to make sure that I may you clarify your question, please, because there was a lot. The question is just like it is your burden to show by clear and convincing evidence that this would have happened anyway. And given that nothing like it had ever happened before, how are you able to carry that burden? And in the absence of some written policy that says, you know, this is the action we will take if you if you do these things. So we have, I believe, in our in our brief, we listed out eight or nine, possibly 10 different rules that were violated. I believe in one of those rules. I'm just going off memory. I believe in one of those rules. It stated that a violation of that particular rule could be grounds for termination. Could be right. But but I mean, I don't think but but you have to show that you would, in fact, have would, in fact, have fired him even without the retaliatory motive. So again, because this was unprecedented. The totality of the circumstances dealing with these five PTC cutouts, the ABV cutout, that is the evidence that that alone, it's so egregious. But so this is what my questions have been getting at. Maybe it's not so egregious. I mean, it seems like there's some testimony that PTC cutouts happened with permission. And so maybe it's not so dangerous. And then this ABV thing, there seems to be testimony that sometimes it cut out on its own and it wasn't his fault. So between those and then also, I mean, Judge Miller's question is getting at if you had a written policy that said someone would always be fired, that would be one thing. But in fact, we have testimony saying the policy was the opposite. They would usually get counseling because they were trying to train them how to deal with this new new system. So with all of those things, how does that not undermine the idea that clear and convincing evidence is no matter what, everyone would be fired for this? Well, so I don't think you can have a that there's a policy. I'm not aware of any railroad that has a policy that lays out that if this event happens, there's going to result in termination. You always evaluate the incidents for what they are individually because each one of these is a unique situation. So I can't tell you that there's a specific policy that's written there that in the event that there are five PTC cutouts and one ABV cutout and these are done without authorization, that that's going to give rise to a termination. Yeah, I'm not aware of any written policy to that effect, but if this isn't the the events, if these aren't the events to justify a termination, I don't know what could justify a termination on the train handling side when you disable these safety features, right? The ABV, disabling the ABV a quarter mile from the San Francisco depot, the evidence is from Mr. Freeman that the engineer doesn't know if he was able to re-engage the braking system as you're coming into the depot, right? It seems very serious if he really did it intentionally and it really happened and the data weren't messed up, but there's at least some testimony that Mr. Cold said he knows that the ABV sometimes cuts out on its own. So why isn't that evidence that maybe this ABV thing wasn't the plaintiff's fault? Your Honor, with respect to the ABV, I mean we're taking a self-serving statement that was made by Mr. Vincenzini, right? Well, it's Mr. Vincenzini saying that Mr. Stogno told him it is hearsay, but usually at summary judgment you can have hearsay and I mean you have Mr. Cold as your employee, I believe, so you could have had a declaration from Mr. Cold saying this conference call never happened, it's not true, but I don't think you have a declaration like that, do you? Mr. Cold is with the FRA and when we attempted, so his job after TASI was with the FRA, when we attempted to get a declaration from him, there was a government lawyer who told us that a declaration could not be obtained from him, even though we were seeking a declaration from him with respect to the time that he spent at TASI. Okay, so did you have a subpoena? Did you move to compel, I don't know, whatever the process would have been? We did not do that. We got resistance from the government's lawyer and we took his deposition on the limited topics that the government's lawyer allowed us to do. Wait, you did take his deposition? We did. But you weren't allowed to ask about this? I don't, Your Honor, I don't want to misstate what we asked or didn't ask. I don't specifically recall and I don't want to provide misleading information to the court. Can I ask you just about your client's principal place of business? So in the notice of removal, you said it's Missouri and I don't know if there's anything in the record, but just from your knowledge, can you tell us anything about what the basis for that statement was? I don't recall offhand, but I don't recall that the removal was challenged. Okay. And again, I apologize that I'm unable to answer the question as to the principal place of business, but I don't believe that there was a challenge to the removal. Okay, thank you. Unless you have anything else, I'll submit. Thank you. I just want to highlight one thing for rebuttal, then I'll take any questions. I want to point out that in the interrogatory responses that are part of the record, volume 235, I don't know if this is the exact site, but I think that is part of the interrogatories. It will show that Mr. Beauchamp was identified in this action early as a witness. Then in the expert disclosures where we didn't provide a report, but we did provide a summary of what his testimony would be and how he would potentially provide opinions on the PTC data recorder records and the reliability of the records. So I'm pointing that out to push back on the assertion that they were somehow caught off guard. You had that in your reply brief already too, I think. Yeah, that they were caught off guard by Mr. Beauchamp. Could I ask you, so the earlier internal proceedings that the union was involved in, it seems like your client did not succeed in that. Should we make anything of that? It seems a little bit unusual that if you're right, that the union didn't think he was right. Oh no, that is not accurate that the union did not think that he was right. And we submitted a declaration of his union representative, I forget his name, stating that by him signing off on the award of the public law board did not mean that he has consented with that decision. So we have that declaration. So maybe I just don't really understand how this internal, who was the decision maker and did the union have to be part of the decision making? Yes, so that's a good question. So this is how the public law board works. It's a three member panel, but for really all intents and purposes, it is a one member panel because you have the union bringing forth the grievance and his name is Mr. Kenny. And he is the one that actually argued in briefing to the public law board, he's not an attorney, that this was improper. He should not have been terminated. Then there is a member of the public law board, which is on the part of the respondent saying, no, we did everything right. Then the third member is actually the arbitrator who makes the decision. So really, although it's a three member panel, it's for all intents and purposes, it's just the public law board arbitrator making the decision. I see, because there's an employer representative, a union representative, and then the arbitrator. And so you're saying they balance each other out and it's not like the union agreed is what you're saying. Right. And the public law board. Do they dissent or what happens? My understanding is if you can write a dissent, but they didn't do that in this case, it wouldn't make any sense for Mr. Kenny to suddenly go against Mr. Vincenzini when he was the one briefing he shouldn't be. And he actually, we did provide, it is in the record of another case where Mr. Kenny explained that just because I have my name here doesn't mean that I'm agreeing with this. And the public law board did not make any sort of determination as to whether or not there was retaliation. The public law board solely based its determination on the record of a non-attorney proceeding handled by non-attorneys, by non-judges, where a lot of evidence was not even put into the record and they just are limited to the record. For those reasons, courts have made the easy conclusion that public law board proceedings cannot be used to collateral estoppel. Unless there's other further questions, I submit. Thank you. Thank you both sides for the helpful arguments. This case is submitted. So the panel will go conference now. Our law clerks will talk to the students. Then we will come back and answer questions from the students, but the questions will not be about any of the cases we heard today. Thank you all. Have a good afternoon.
judges: GOULD, FRIEDLAND, MILLER